Our final case for today is United States v. Mario Rodriguez-Escalera. Mr. Kapsack. Good afternoon, Your Honors, and may it please the Court, my name is Daniel Kapsack. I'm an Assistant United States Attorney from the Southern District of Illinois, and I'm here today on behalf of the appellant, the United States. Your Honors, we respectfully assert that the District Court in this case erred in finding that the appellee had standing to challenge the search of a vehicle in which he was a mere passenger, and make no mistake, that is what he was. He was neither an owner nor a driver of a stopped vehicle, but a mere passenger. What if they had been common-law spouses? They are, they refer to themselves as one another's fiancés, they live together. Yes, the title is in Moran's name, but it seems to me in today's world, where less than half the people in the United States bother with marriage anyway, you know, these are ancient lines. And it may be going that way, Your Honor, but there's no case law that the government could come across to support that vague notion. What we have here, really, is... What's vague about it? I mean, they live together, they... I don't understand what's vague about the relationship. Well, they did, but there was only one driver, and that was Blanca Moran, who also was the other, that the appellee had driven the car, intended to drive the car. Oh, but there is evidence that he intended to drive the car, because when they find out that her license is suspended, they look at his license, a Mexican license, to make sure that it's a valid license, because obviously they can't let somebody go off with the same problem, and so there's every intention to have him drive the car. But that was after, and Blanca Moran was still the owner of the vehicle. That's a key distinction. She's the only person who had the reasonable expectation of privacy in that car. She had the ownership interest, and that's really the difference between the driver and the appellee. But, of course, he's been seized by the stopping of the car. That's correct, Your Honor, and that's where Brennan comes into play, and this court, of course, has given guidance to Brennan in the context of a passenger and a traffic stop. It said that the passenger can challenge a search that results from a traffic stop in very limited circumstances. They are, first, that the police decision to stop the car or extend the stop was unjustified. That's the first part. And aren't we on the extend branch of that? That's exactly where we are, Your Honor. That's really the crux of the case under a two-part analysis this court has under Brennan, and in this case, the stop was reasonably extended based upon reasonable suspicion of criminal activity on the part of the appellee as well as the driver. When do you think the extension began? I mean, he stops, and I guess when all is said and done, it's about 30 minutes, the first 15 of which, you know, he's talking to the driver, he's going over and talking to Mr. Rodriguez as well. When's the first stop end? When he gives her the warning? Correct, Your Honor. When everything is handed back to the driver, Blanca Moran, and then... She thinks he's been stalling even then to get the dog unit to come. Yes. The district court made that conclusion. That was a very subjective conclusion, and of course, it's one the government very strongly disagrees with, and we believe the facts and the record, particularly the dash cam video, belies that completely and shows otherwise. So to answer your question, Your Honor, stop... Are we supposed to watch that video as if we were the trial court? I think in this, obviously, there's deference that's given by this court to the district court. I think in this case, it's particularly helpful in showing why the district court reached the wrong conclusion as to the ISP officer and what he was doing. In what way? I have watched it. She claims very clearly that he was stalling and doing nothing during the course of the stop, but the officer explains in his testimony exactly what he was doing at each juncture, and he also explains... She also finds that he's not credible. Yes, but her decision there to find him incredible is on a very narrow line of reasoning. It's on a very narrow fact, as she sees it, and that is as to his stalling. Your Honor, in everything else, she basically credits his testimony, from the beginning of the stop, the basis for the stop, the fact that he separates them and why... Right, but it's the stalling that we're focused on here. Yeah, that's... Well, he was clearly stalling there, and she didn't credit everything. She... You know, like he said, oh, that she was nervous. The district court found otherwise. I watched the video. I think there's certainly every reason to uphold that. It was certainly not an abuse of discretion to find that she wasn't nervous. Well, Your Honor, the government, of course, takes a different view. And that's credibility. Takes a different view, but what we also have to do is look at the totality of the circumstances as to all these factors. The nervousness is one of them, but there are other more important ones, including the... The lack of... ...implausibility and the conflicting travel information. And if you're honest, remember nothing else. But the district court gave a very good explanation for why, what seemingly, I mean, when I first read your brief, I thought, well, yeah, okay, that's completely inconsistent. But there's, she didn't know, or actually, when asked, she said, yeah, I told him it was Pennsylvania. So, and she didn't know he had said that, as far as I could find. Well, her explanation was, is that this was supposed to be a surprise. But she came up with the word Pennsylvania, the place Pennsylvania, independently of her knowing that he had said we're going to Pennsylvania, and the district judge placed weight on that fact. The district judge said, yes, she says it's New York, and then she immediately, with no prompting, no opportunity to communicate with Rodriguez, says it's Pennsylvania. I mean, there are 50 states, you know, it seems unlikely that she would have popped out with that. But importantly, she also says that the appellee knew how long the trip was going to be for. She says two weeks. Recall that the appellee said two days. And guess what? If you start from Los Angeles, and you drive all the way over to New York, and visit New York for a little bit, and then drive back to Los Angeles, you've probably taken a two-week trip, even though you only spent a few days in New York. Well, theoretically, Your Honor, but what this doesn't address, and this is what the district court doesn't address, is the sheer implausibility of these plans. She addresses the conflicting nature, but not the implausibility. And if Your Honors remember, nothing else- Why are the plans implausible to go vaguely to New York and say, oh, it's a big city, we don't have any hotel lined up, and we're just going to kind of wing it? People do that all the time. Maybe I know a different set of people than you do, but people do that all the time. They'll go to Paris and bum around. For someone who's never been there, Your Honor, to go to, to say they're going to New York and have no idea where they're going, and importantly- I don't understand why that's implausible at all. Well, Your Honor, if you're going to go to a city, especially for the first time, like New York, for two weeks, and not have a place to say- I didn't say two weeks, I said that, she said the trip was going to be, they'd already been how many days? I mean, it was- They were driving across the country, but the trip was, their destination, according to the driver, was New York. She said it was a two week trip. Now, regardless of how long you're going to be in a major city- She said she had about two weeks off, I think is what she said. That's correct. But she was going to a major city with no plans, and what really stands out is when the officer asks her where exactly, what she wants to see in New York, she says, and I quote, I want to go see the, what do you call it, the Statue of Liberty. This shows no effort on her part to really think about what it is she's going to be doing when she's there. Have you never gone to a place and just gone to the visitor center and said, well, what's here? I mean, honestly, if we're supposed to find, as a matter of law, that only people with pre-arranged itineraries are on a legitimate trip, you're going to be arresting a lot of people. Well, Your Honor, I summarized what the driver said, but we also have to remember what the police said. He said they were going to Pennsylvania with no place in particular to go, no one to see, and no purpose in being there. So it's not just the driver, it's both these people. We can disagree as to what plans you would have when you go someplace. I'm here in Chicago. I made plans to stay at a hotel, but to me, that's normal. I think going to New York and not having a place to stay and not being able to articulate what it is you really want to see really stands out as a factor under reasonable suspicion. But again, it's more than just that. It's the multiple air freshers in the front and rear of the vehicle. This court has repeatedly said that Los Angeles is a known drug distribution center. As is every major city in the United States, I might add. But yes, Los Angeles is, Houston is, Dallas is, you know. So when you start eliminating, you're saying that, yeah, we have to consider, and I'm sure that's right, the totality of the circumstances. But if some of the totality of the circumstances just don't stand up to scrutiny, then we get a lot narrower. I was trying to figure out exactly what multiple air fresheners mean. There is some reference in cases, but I don't know. So there were four in this car. There were. There were two in the front and two in the back. And the officer explained that it also gave, it's not just the number of air fresheners, it was the overpowering odor that was emanating from that. Did he say that? Which in his experience. Did he say that? Yeah, which in his experience is an indicator of a masking agent, essentially. Two in the front, two in the back, a very strong odor. He made very clear in the record, Your Honor, that that stood out to him as being suspicious. He noticed it. As a matter of fact, the district court misstated the record in saying that the officer didn't notice two in the back. In fact, he did. And the district court really misapplied the totality of the circumstances test here throughout. It went through each factor and isolated them from the others. Well, you sort of have to if you're going to talk about all the factors. I guess you could have the final paragraph saying, and now the totality. It was made very conclusive. You've actually used up all of your time at this point. So maybe I'll ask you to sit down and I'll give you a final minute. Thank you, Your Honor. Mr. Welby. May it please the court. Good afternoon. I'm Steve Welby. I'm the federal public defender for the Southern District of Illinois here for Mario Rodriguez. So here's my issue with this case, Mr. Welby. I mean, the first stop, the traffic stop, is a legitimate traffic stop. You know, there's... Right. So that much is okay. And that gets us off to the side of the road and it gets the trooper looking at both Moran and Rodriguez. And then we get into this sort of fuzzy thing about... And actually at the very end, it's Moran's car. So she can give consent to search the car. It's hard for me to see the nature of her consent as coerced, frankly. She doesn't seem coerced to me at the moment. She's sort of waving around saying, you know, go ahead and do it. He seems a little shocked that she decided to do that, but that's different. So we wind up, you know, about whether this was unlawfully extended after, you know, whether it's dragging his feet to write the warning and then eventually, of course, to find out to also write the paperwork on the suspended license. I was bothered by the air fresheners, to tell you the truth, you know, masking, and although you can come up with an explanation about the places, I was bothered about the places as well. I'm not as worried about no hotel in New York, which seems to me not probative of much. Well, if I could address those in turn, Your Honor. With respect to the coercion, I think the government, in its brief, describes the consent as being coerced. I believe the judge's ruling was that it was the fruit of the poisonous tree of the unlawful detention in her order in Ms. Moran's case. The judge found it was coerced, the government chose not to appeal in her case, correct? That's correct, that it was unlawful and not effectual. The second issue on the air fresheners and the other factors, I think the judge looked at all five of the factors. If you look at page six of her order, the same exact five factors that the government lists in its brief are the same factors that the judge describes when she's considering the totality of the circumstances. So it's a reasonable suspicion standard though, right? We're not beyond that. We would need to get beyond that for the search, but for where we are in this point in time, yes. Right. For prolonging. For prolonging, yes. It was pretty long. It was over... Over half an hour. Yes. I believe 35 minutes or so before they actually conducted the search. And I don't want to dodge your question on the air fresheners. The judge addressed that in her order. She considered it. I think it's a fair reading of her order that she thought the issue was being exaggerated. I think when you watch the tape, there's not one mention of air fresheners. I think when you read the officer's report, there's not one. But it's a smell. I mean, I guess the trooper is thinking, who would want this overpowering smell? Maybe other people like this smell, but who would want that permeating the car if there wasn't a reason? Well, I've driven that distance from Los Angeles to St. Louis, and your car smells a little funny when you get back. So there's a good reason to have air fresheners. But I think this idea that the air fresheners were so important to the officer's decision, when you watch the tape, he says not one word about the air fresheners. His report says not one word about that. In his discussions with the other officers, he doesn't mention the air fresheners. None of the other officers mention air fresheners. And when you look at the photographs, there's all kinds of junk in that car. There's no photographs that highlight those air fresheners as being of some significance. It seems to only take on significance when it is obvious that the officer has extended the stay beyond the point where he can hold the folks without reasonable suspicion. And that's what the judge said happened in this case. And the government says, we are strongly opposed to this determination that it had been extended, but it didn't challenge that in its brief. I didn't see anything in here saying the judge erred in making that conclusion. Do you have any idea, Mr. Welby, how many motions to suppress have been denied in drug in Illinois that we've affirmed on credibility findings? A lot. I don't know a number, but I don't usually get to sit at that table anymore. So yeah, we usually lose these. And I think when you watch the tape, it's obvious that they're stolen. And all of this leads up to the point where normally in a case, they extend it, then there's a question of whether it was properly extended, did they have reasonable suspicion, the dog comes, the dog hits, they find the drugs. We have the opposite here. At what point do you think this became unreasonably prolonged? I think to issue a warning ticket to someone for an improper lane change could not take more than 10 minutes. And even if you add on the fact that there was... Even if you run the license and you find out that it's suspended, doesn't that start making you think, well, what's going on here? I think at the point that the license is suspended, he makes the decision to issue another ticket that given him the benefit of the doubt, that might take a few more minutes to add a second charge. But these are basic routine charges and this idea that he's flipping through his statute book to find the proper codes for a lane change and driving while suspended, those are routine traffic tickets that the officer should be able to write in minutes. We know that there was... Did the district judge knew, this is my question, that the officer knew that the canine unit that was available was going to be tied up for another 10, 15 minutes, right? Yes. And did that figure in the district judge's evaluation about credibility and prolonging? Yes. I think that's why she used the word stalling. She said he was stalling because she knew the officer with the canine unit was not available and he was driving at a very high rate of speed with the dog in the back to get to there as quickly as possible because they, I think, were cognizant of the fact that they had unlawfully extended this detention beyond a point where it was reasonable. Certainly was driving fast. Absolutely. I don't know the speed, but... By the video. There's quite a bit of time on that video where there doesn't seem to be of the officer focusing on the car where nothing seems to be going on. Yes. And I think that's where she said he was stalling. Just sitting there, your job is to issue the traffic tickets. That's the mission. And he had plenty of time to complete that mission. And I think the judge found it was obvious that he was stalling. I don't know that that's been directly chanced on appeal. The government said the issue was whether there was reasonable articular suspicions. Well, that's right. That is the question. I mean, even if he was stalling, he could have been stalling if he, by that time, already had articulable, reasonable suspicion to wait for the dog, let's say. Right. And I don't think it's fair, the way the government has characterized the district court's decision, that she looked at each of those factors in isolation. I think if you look at her order, she notes in the verbal order that she gives, she makes repeated mention to the fact that you can't assess these factors in a vacuum. You have to look at the totality of the circumstances. That's at 156. At 163, she says she's considering the factors individually in a combination. She also repeats that at 166. And at 166 and 163, at the end, she says, considering all of the facts in the case, this is my conclusion. In a written order, she outlines the same five factors that the court considers. On page eight, she says she's looking at those factors, both in combination and in isolation individually. That's exactly what the totality of circumstances test requires. And at the end, she concludes that the proffered evidence, individually and in combination with the other factors, were insufficient to support reasonable suspicion. That's the job of the district court to make that. I think she executed that properly. The issue of consent that was raised a second ago, I don't think you can be in a situation where you get the consent that's the fruit of the poisonous tree or coerced on behalf of Ms. Moran, you have an unlawful detention on behalf of Mr. Rodriguez, and somehow those both cancel each other out, and it's okay. You can't be in a situation where you coerce a consent, you have two people in a car, you coerce one person, and you coerce the consent from the other person, and you say, well neither party can object because the other guy consented, and you can't challenge it. That's the Johnson case that we outlined in her brief. Two wrongs in that situation can't make a right. So are you making the argument, you haven't made the argument, have you, that as to the searches of the suitcases, there was an obligation to find out which suitcase belonged to whom? I don't think the officers had an obligation to find that out ahead of time. I think the defendant immediately, I think it was obvious that there was a man and a woman in a car, there were men's clothes in the suitcase where most of the drugs were found, and immediately after the drugs were found, Mr. Rodriguez claimed ownership of those drugs. So I think claimed ownership of that, he said, it's mine, is what he said. So I don't think you're in a case here where you are in Shabazz where the person at the time of arrest makes no claim of ownership, at the time of the filing of the motion to evidence of ownership, and then on appeal says, well, hey, that was my suitcase. That's not what we have here. We have a situation where it's being searched, and obviously the defendant immediately claimed responsibility for the contents of that suitcase. But to answer your question directly, I don't think the officers have to divide up the luggage and say whose bag is this. But I think the question is, is there a violation of his constitutional rights when the search of his suitcase takes place while he's being unlawfully detained? And I think the answer to that is yes. I see I'm out of time, but if you have any further questions. I see none, so thank you very much. And I said I would give you one final minute, Mr. Kapsuch. Thank you, Your Honor. I appreciate that. I do just want to clarify one thing for the record. The government never, the government has never conceded that the consent was coerced. That did not happen. We chose not to appeal that issue, but that's a very important difference. Also, Your Honor, the trooper in this case did mention in his reports about the air fresheners. It was an important factor to him as to reasonable suspicion. And I also want to note one final time, that at the end of the day, with regard to any inequity or injury as to the appellee, the drugs that were in this vehicle, by his own admission, belonged to the appellee. They were his, not the driver's. So if this court were to vacate the order, and considering the fact that the government has dismissed the other appeal, there would be no inequity or injury as to the appellee. They were his drugs. Your Honor, for all those reasons, we ask that this court vacate the district court's order. All right. Thank you very much. Thanks for both counsel. We'll take the case under advisement, and the court will be in recess. Thank you.